IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JONATHAN M. RITCHIE AND JANUARY J. RITCHIE, | ) CIVIL NO. 08-00133 JMS/LEK ) ) ORDER (1) GRANTING IN PART |
| Plaintiffs, | ) AND DENYING IN PART ) PLAINTIFFS' MOTION FOR |
| vs. | ) PARTIAL SUMMARY JUDGMENT ) AS TO LIABILITY OF DEFENDANT |
| WAHIAWA GENERAL HOSPITAL, | ) WAHIAWA GENERAL HOSPITAL ) AND (2) DENYING DEFENDANT'S |
| Defendant. | ) MOTION FOR PARTIAL SUMMARY ) JUDGMENT ON COUNTS II AND IV ) OF PLAINTIFFS' COMPLAINT ) REGARDING CLAIMS FOR ) INTENTIONAL INFLICTION OF ) EMOTIONAL DISTRESS AND ) PUNITIVE DAMAGES ) |
| _____ | ) |

**ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY OF
DEFENDANT WAHIAWA GENERAL HOSPITAL AND (2) DENYING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
COUNTS II AND IV OF PLAINTIFFS' COMPLAINT REGARDING
CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
AND PUNITIVE DAMAGES**

## I.  INTRODUCTION

On August 25, 2006, five-month pregnant Plaintiff January J. Ritchie

("January") was rushed to Defendant Wahiawa General Hospital ("Defendant" or

"Wahiawa General") on the island of Oahu, Hawaii with early contractions.  The

next day, she delivered her son, Gregory Michael Ritchie ("Gregory"), who was either stillborn or died shortly after birth.  When January and her husband Jonathan M. Ritchie (collectively, "Plaintiffs") attempted to pick up Gregory's remains on April 20, 2007, Wahiawa General could not locate them.  After a search and internal investigation, Defendant has still not found Gregory's remains or determined their whereabouts.

Subsequently, Plaintiffs filed this action against Defendant alleging negligence; negligent, reckless, and/or intentional infliction of emotional distress; and tortious interference with the right to bury Gregory in accordance with their religious practices.  Currently before the court is Plaintiffs' Motion for Partial Summary Judgment as to Liability of Defendant ("Plaintiffs' Motion for Partial Summary Judgment") and Defendant's Motion for Partial Summary Judgment on Counts II and IV of Plaintiffs' Complaint Regarding Claims for Intentional Infliction of Emotional Distress and Punitive Damages ("Defendant's Motion for Partial Summary Judgment").  Based on the following, the court (1) GRANTS in part and DENIES in part Plaintiffs' Motion for Partial Summary Judgment and (2) DENIES Defendant's Motion for Partial Summary Judgment.

///

///

## II. <u>BACKGROUND</u>

**A.    Factual Background**

*1.    The Delivery*

On August 25, 2006, five-month pregnant January was admitted to Wahiawa General with contractions.  Pls.' Exs. 1 at 29-30, 4 at W0082;[1] Kohrer Decl. ¶ 3.  At approximately 10:09 a.m. the next day, January delivered Gregory, which Dr. William McKenzie ("Dr. McKenzie") first documented as a "stillborn infant" that "showed no signs of life."  Pls.' Exs. 2-3.[2]  When Gregory was given to January to hold, she felt and saw a strong heartbeat, which she reported to Dr. McKenzie and the attending nurses.  *Id.*; Pls.' Ex. 1 at 70-71.  Although neither Dr. McKenzie nor Tammy Kohrer, a registered nurse who attended the birth ("Nurse Kohrer"), noted any signs of life,[3] *see* Def.'s Opp'n Ex. B at 26-27, 29; Kohrer

---

[1]  Plaintiffs attach one set of exhibits to their Concise Statement of Facts in Support of their Motion for Partial Summary Judgment (Pls.' Ex.) and one set of exhibits to their Concise Statement of Facts in Opposition to Defendant's Motion for Partial Summary Judgment (Pls.' Opp'n Ex.).  Defendant attaches one set of exhibits to its Concise Statement of Facts in Support of its Motion for Partial Summary Judgment (Def.'s Ex.) and one set of exhibits to its Concise Statement of Facts in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Def.'s Opp'n Ex.).

[2]  Because a 20-week old fetus is nonviable -- incapable of surviving outside of the womb -- no resuscitation is performed even if the infant shows signs of life after birth such as breathing or a heartbeat.  Kohrer Decl. ¶¶ 4-5; *see also* Def.'s Opp'n Ex. B at 29 (noting Gregory was handed to the mother without examination because he was nonviable).

[3]  Nurse Kohrer maintains that Gregory was not alive at birth because she noticed signs of death prior to delivery (*i.e.*, maceration of the skin) and did not observe any cardiac activity or see any other movement.  Kohrer Decl. ¶¶ 7-8.  She did not, however, examine Gregory's chest

3

Decl. ¶¶ 7-8, Dr. McKenzie later added on January's chart that a heartbeat was detected and recorded Gregory's time of death as 10:39 a.m.  Pls.' Exs. 2-3; Def.'s Opp'n Ex. B at 29.

At some point while January was in surgery on August 26, 2006, Gregory's remains were taken to the hospital morgue.  *See* Gage Decl. Ex.1.

### 2.    *The Birth and Death Certificates*

Before leaving the hospital on August 30, 2006, January met with Wahiawa General Patient Liaison Dawn Michell ("Michell").  Michell Decl. ¶ 2.[4] Michell recalls that January requested a birth certificate for Gregory, and she informed January that Wahiawa General would not issue one because Gregory was stillborn.  *Id.*  January recalls that this meeting was to address her concerns about Gregory's remains staying at the hospital until Plaintiffs could make funeral arrangements.  Pls.' Opp'n Ex. 1 at 84.

After meeting with January, Michell looked into whether Wahiawa General should issue a birth certificate for Gregory because, even though Dr. McKenzie noted on January's chart that Gregory had a heartbeat and lived for

---

with a stethoscope.  *Id.*  Dr. McKenzie also "didn't really check the baby" before giving Gregory to January to hold because he "knew it was nonviable."  Def.'s Opp'n Ex. B at 29.

[4] All citations to the Michell and Bitonio Declarations refer to the declarations attached to Defendant's Opposition.  Plaintiffs also submitted separate Michell and Bitonio Declarations as Exhibits 11 and 12 in Support of their Motion for Partial Summary Judgment, which are cited as Plaintiffs' Exhibits 11 and 12.

thirty minutes, only January witnessed Gregory's heartbeat firsthand.  Michell

Decl. ¶¶ 3-5.  Michell consulted the Ob-Gyn Chief and the hospital's insurer who

determined that a birth certificate should not be issued.  *Id.* ¶ 5.  Dr. McKenzie,

however, disagreed and believed Wahiawa General should issue the birth

certificate.  Pls.' Opp'n Ex. 2 at 44-45.

In late October 2006, Plaintiffs called Wahiawa General to obtain

Gregory's birth certificate.  Pls.' Exs. 1 at 39, 9 at 39.  After contacting Defendant,

Plaintiffs had a meeting with Michell, the Director of Patient Services Kelly

Bitonio ("Bitonio"), and a hospital social worker to discuss whether the hospital

would issue a birth certificate.  Pls.' Exs. 1 at 39-41, 9 at 39-40; Michell Decl. ¶ 6;

Bitonio Decl. ¶ 4.  Plaintiffs claim that Defendant told them Wahiawa General

would not issue a birth certificate, in part, because of the instruction of their

insurance lawyers.  Pls.' Exs. 1 at 39-41, 9 at 39-40.  Defendant maintains that

Wahiawa General Staff explained they could not issue a birth certificate because

Gregory was stillborn.  Michell Decl. ¶ 6.

Plaintiffs also claim that Wahiawa General personnel told them that

they could contact a mortuary to pick up Gregory's remains without a birth

certificate.  Pls.' Exs. 1 at 42, 9 at 42.  When Plaintiffs contacted mortuaries,

however, they were informed that they needed a birth and death certificate before

they would retrieve the body.  Pls.' Exs. 1 at 95, 9 at 42-43.

After this meeting, Plaintiffs contacted Dr. McKenzie who told them "not to worry" because he would help them get the birth certificate.  *See* Pls.' Exs. 1 at 43-44, 9 at 40.  At some point later, Dr. McKenzie went to Wahiawa General's Director of Medical Records June Beaumont ("Beaumont") and asked her to process the birth certificate because January felt a heartbeat.  Def.'s Opp'n Ex. C at 14-15.  Beaumont, however, claims that she did not issue a birth certificate at that time because she called Dr. David, Head of Vital Statistics at the State of Hawaii Department of Health ("Vital Statistics") who told her to wait until he spoke to Dr. McKenzie directly.  *Id.*  Subsequently, Dr. McKenzie spoke to Dr. David, who determined that Gregory was a live birth, after which Dr. McKenzie "went back to the [Wahiawa General] medical records and . . . gave them the name of whoever [he] talked to at [Vital Statistics] and said, you know, we need a birth certificate and we need a death certificate and eventually they gave that to [him] and [he] signed it."  Def.'s Opp'n Ex. B at 46.

On January 5, 2007, Wahiawa General personnel submitted information online to the State Department of Health in order to process Gregory's birth certificate.  Pls.' Ex. 5; Def.'s Opp'n Ex. C at 18, 22.  Wahiawa General, however, submitted the incorrect birth date which delayed the issuance of

Gregory's birth certificate until March 27, 2007.  Pls.' Exs. 5-7.  Plaintiffs received the corrected birth certificate in March or April 2007.  Def.'s Opp'n Ex. A at 97-98.

On February 12, 2007, Dr. McKenzie certified Gregory's cause of death to the State Department of Health.  Pls.' Ex. 8.  Gregory's death certificate was filed by the State registrar on April 20, 2007.  *Id.*

### 3.  *Wahiawa General's Morgue Policy*

Wahiawa General policy requires that any person who transports a body to the morgue must sign the "morgue book" (also referred to as the "morgue log") which documents the name, age, and time of death of the deceased person, the attending physician, and the date of placement in the morgue.  Gage Decl. ¶¶ 2-3; *see also* Kohrer Decl. ¶ 13; Bitonio Decl. ¶ 7.  Wahiawa General's policy also mandates that (1) fetal remains be wrapped in a bag or blue chux and labeled with the baby's name, date of birth, and physician's name and placed in the walk-in cooler, Def.'s Opp'n Ex. D at A000012; (2) only authorized Wahiawa General personnel have access to the morgue using a morgue key, Bitonio Decl. ¶ 6; (3) Defendant keeps a "key control log" that documents who signs out the morgue key, *id.*; and (4) a nurse supervisor must assist removal of a body from the morgue to mortuaries.  Gage Decl. ¶ 2.  At the time of removal, a nurse supervisor must

confirm that the mortuary transporter has authorization to remove the body and document the name of the mortuary and the date and time on the morgue log.  *Id.* ¶ 3; Kohrer Decl. ¶ 13.

### 4.   *Loss of Gregory's Remains*

On or about April 20, 2007, Mililani Mortuary arrived at Wahiawa General to pick up Gregory's remains to prepare them for shipment to California. Pls.' Ex. 1 at 100-02.  Wahiawa General, however, could not locate Gregory's remains.  *Id.*; Michell Decl. ¶ 8.

Michell, Bitonio, Assistant Director of Nursing Jean Look, and others conducted an unsuccessful two-hour search for Gregory's remains.  Michell Decl. ¶ 8; Bitonio Decl. ¶¶ 5-6.  Although Gregory's remains were never signed out on the morgue log, *see* Gage Decl. ¶ 4; Def.'s Opp'n Ex. 1, Wahiawa General also contacted various mortuaries to see if they had picked up the remains by mistake. Michell Decl. ¶ 8; Bitonio Decl. ¶ 7.  After the search was exhausted, Bitonio called January to explain the problem.  Bitonio Decl. ¶ 8.

Over the next two days, Michell and Bitonio interviewed over fifteen staff members, including medical and cleaning staff, who had access to the morgue

key during that time.[5]  Michell Decl. ¶ 8; Bitonio Decl. ¶ 6.  None of the employees recalled seeing Gregory's remains after, on, or about March 27, 2007 when the remains -- wrapped in a chux and blanket and placed into a small basket -- were moved to accommodate another body.  *Id.*[6]  Subsequently, January met with Bitonio again.  Bitonio Decl. ¶ 8.

Defendant never located Gregory's remains or determined the cause for their loss.  Bitonio Decl. ¶¶ 8-9; Michell Decl. ¶¶ 8-9.  Defendant's expert witness Jeffrey Killeen, M.D., a board certified physician in anatomic and clinical pathology and Director of Laboratories, Clinical Laboratories of Hawaii at Kapiolani Medical Center for Women and Children hypothesizes that "due to the small size of the basin in which the remains were stored and the decomposition of the remains over the length of time they were in the morgue, the basin was inadvertently misplaced or discarded by someone who did not recognize what it contained."  Killeen Decl. ¶ 7.[7]

---

[5]  Wahiawa General staff reviewed the "key control log" to determine whom to interview. Bitonio Decl. ¶ 6.

[6]  In its investigation, Wahiawa General did not find any affirmative evidence that anyone intentionally displaced or destroyed the remains.  Bitonio Decl. ¶ 9; Michell Decl. ¶ 9.

[7]  Defendant also claims that due to the limited size of the Wahiawa General morgue it is very difficult to store remains for many months because it often requires that they be moved and relocated.  Pls.' Ex. 12 ¶ 6.

### 5.    *Plaintiffs' Resulting Emotional State*

As a result of Gregory's death, the loss of his remains, and an inability to have a proper Catholic funeral,[8] Plaintiffs assert that they have experienced anxiety and depression.  *See* Pls.' Opp'n Exs. 1 at 119-24, 5 at 55.

Between August and October 2007, January began having anxiety attacks and suffering from depression, which she and her therapist at the time, Pat Debusca ("Debusca"), attributed to Gregory's death, the loss of his remains, and an inability to obtain closure.  *See* Pls.' Opp'n Ex. 1 at 121-24.  During this time, January met with Debusca for scheduled and unscheduled appointments, attended group therapy for grief and loss, and began taking Zoloft -- a drug for the treatment of depression and anxiety.  *Id.* at 119-22.  As of September 18, 2008, January was still on Zoloft, had found a therapist in Washington State,[9] and planned to continue seeing a therapist regularly.  *Id.* at 116, 123-24.

As a result of the loss of Gregory's remains, Jonathan reports feeling depressed, angry, easily irritated, and has experienced sleepwalking episodes and a

---

[8]  Plaintiffs held a memorial service for Gregory on May 8, 2007 in California without the remains.  Pls.' Ex. 1 at 110, 116.  The memorial service, however, was not in accordance with Plaintiffs' Catholic faith, which "expresses a consistent preference for all funeral rites to be celebrated in the presence of the body."  Pls.' Exs. 1 at 110, 116, 13 at 2.

[9]  In October 2007, the Army relocated January from Hawaii to Washington.  Pls.' Opp'n Ex. 1 at 121, 124.  Around September 2008, January began counseling in Washington.  *Id.* at 116.

heightened need to be with his daughter, which he calls "separation anxiety."  Pls.'
Opp'n Ex. 5 at 55.  Defendant disputes that Jonathan's sleepwalking episodes are
the result of the loss of Gregory's remains because Jonathan was discharged from
the Army for sleepwalking in April 2005.  Def.'s Reply Ex. F at 7-8, 17.

**B.      Procedural Background**

On March 21, 2008, Plaintiffs filed their Complaint alleging that
Defendant negligently misplaced Gregory's remains, interfered with their right to
bury him in accordance with their religious practices, and thereby intentionally,
recklessly, and/or negligently caused them emotional distress, and requesting
special, general, and punitive damages.

On November 7, 2008, Plaintiffs filed a Motion for Partial Summary
Judgment.  On November 26, 2008, Defendant filed an Opposition.  On December
2, 2008, Plaintiffs filed a Reply.  Also on December 2, 2008, Defendant filed a
Motion for Partial Summary Judgment.  On December 18, 2008, Plaintiffs filed an
Opposition, and on December 24, 2008, Defendant filed a Reply.  A hearing was
held on January 5, 2009.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of
material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest on mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on

12

which a reasonable fact finder could find for the nonmoving party, and a dispute is

'material' only if it could affect the outcome of the suit under the governing law."

*In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at

248).  When considering the evidence on a motion for summary judgment, the

court must draw all reasonable inferences on behalf of the nonmoving party.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille*

*Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn

in his favor." (citations omitted)).

## IV.  <u>ANALYSIS</u>

### A.    **Plaintiffs' Motion for Partial Summary Judgment**

            While not entirely clear, it appears that Plaintiffs bring their Motion

for Partial Summary Judgment on their claim of negligence based upon

Defendant's loss of Gregory's remains and upon Defendant's delay in forwarding

information necessary for the State to issue a birth and/or death certificate as

required by its own policies and Hawaii Revised Statutes ("HRS") §§ 338-5 and

338-8.  For the following reasons, the court GRANTS Plaintiffs' Motion for Partial

Summary Judgment as to Defendant's loss of Gregory's remains and DENIES

Plaintiffs' Motion for Partial Summary Judgment as to Defendant's conduct

13

regarding the issuance of Gregory's birth and/or death certificate.[10]

### 1. *Law*

"[T]hose who are entrusted with the care and preparation for burial of a decedent's body have a duty to exercise reasonable care." *Guth v. Freeland*, 96 Haw. 147, 154, 28 P.3d 982, 989 (2001).  "The duty to use reasonable care in the preparation of a body for funeral, burial, or crematory services, or in the rendition of those services, runs to the decedent's immediate family members who are aware of the services and for whose benefit the services are being performed." *Id.* at 155, 28 P.3d at 990.  Immediate family members include decedent's parents. *Id.*

"Issues of negligence are ordinarily not susceptible of summary adjudication; however, where there is no dispute in the evidence before the trial court, it has the duty to pass upon the question of negligence and proximate cause as a matter of law." *Pickering v. State*, 57 Haw. 405, 407, 557 P.2d 125, 127 (1976).

///

///

_____

[10]  To the extent Plaintiffs make a claim of negligence *per se* based upon Defendant's failure to follow their own policies or HRS §§ 338-5 and 338-8, the court DENIES Plaintiffs' Motion for Partial Summary Judgment.  *See Mederios v. Haw. Dept. of Labor & Indus. Relations*, 108 Haw. 258, 276, 118 P.3d 1201, 1219 (2005) ("[N]oncompliance with an established statutory standard is not necessarily conclusive proof on the issue of negligence, . . . but is merely evidence of negligence[.]" (citation signals omitted)).

   2.   *Application*

   Defendant concedes it had a duty to reasonably care for Gregory's

remains but contends that Plaintiffs failed to establish that Defendant breached that

duty as a matter of law.  For the foregoing reasons, the court disagrees in part.

   a.   *Negligence for misplacing the remains*

   Based on a thorough review of the record and viewing the evidence

presented in the light most favorable to Defendant, the court finds that Defendant

did not reasonably care for Gregory's remains, which proximately caused the loss

of his body.  Plaintiffs have put forth sufficient evidence that Defendant's

negligence is the only possible explanation for the loss of Gregory's remains --

namely that the carelessness of an unidentified Wahiawa General employee at

some unknown point between March 27, 2007 (the last day Wahiawa General

employees recall seeing the body) and April 20, 2007 (the day Mililani Mortuary

arrived to pick up the remains) directly resulted in the loss of their son's body.

Specifically, Plaintiffs have demonstrated that: (1) Defendant's policies require

that a chain of custody be maintained for each body, only authorized Wahiawa

General personnel have access to the morgue using a morgue key, and infant

remains be wrapped in a bag or blue chux labeled with the baby's name, date of

birth, and physician's name, Gage Decl. ¶¶ 1-3; Bitonio Decl. ¶ 6; Def.'s Opp'n

Ex. D at A000012; (2) Gregory's body was wrapped in a chux and blanket and placed in a small basin per Defendant's policy for storage of infant remains, Michell Decl. ¶ 8; Pls.' Ex. 14 at A000012; (3) Gregory's remains were properly signed into the morgue but never signed out, Def.'s Opp'n Ex. 1; (4) only a nurse supervisor is authorized to remove remains from the morgue, Gage Decl. ¶ 3; and (5) Defendant lost Gregory's remains and has no information regarding their whereabouts.  Bitonio Decl. ¶¶ 8-9; Michell Decl. ¶¶ 8-9.  Further, at the hearing, Defendant conceded that Gregory's remains could only have been removed from the morgue by Wahiawa General personnel acting within the scope of their employment.[11]  Because Defendant concedes that an employee lost Gregory's remains while acting within the scope of his or her employment *and* any removal or disposal of the remains was necessarily against Wahiawa General policies, any conceivable explanation for losing Gregory's remains constitutes negligence by the Defendant.[12]

_____

[11]  "Under the doctrine of respondeat superior, an employer is held vicariously liable for the negligent acts of an employee committed while the employee was acting within the scope of the employer's business." *Yamane v. Pohlson*, 111 Haw. 74, 78 n.7, 137 P.3d 980, 984 n.7 (2006); *State v. Hoshijo ex rel. White*, 102 Haw. 307, 319, 76 P.3d 550, 562 (2003).

[12]  For example, it is of no consequence whether a nurse incorrectly sent the remains to the wrong mortuary or a cleaning person failed to recognize the remains and improperly disposed of them because any possible scenario requires that Defendant's employee violated Wahiawa General's policies -- thereby either "doing something that a reasonable person would not do or failing to do something a reasonable person would do" under the circumstances.  *See Moyle v. Y & Hyup Shin, Corp.*, 118 Haw. 385, 389, 191 P.3d 1062, 1066 (2008) ("Negligence is

Further, because Plaintiffs have carried their Rule 56(c) burden, Defendant's inability to come forward with *any* explanation for the loss of Gregory's remains that does *not* involve a Wahiawa General staff person negligently misplacing the remains is fatal.  While the exact negligent act remains unknown, Defendant must reply with more than "some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial" on the issue of negligence in order to overcome summary judgment.  *See Matsushita*, 475 U.S. at 586-87.

Defendant's argument that its policies governing the care of infant remains are reasonable and meet the standard of care fails because Defendant does not provide any evidence that Wahiawa General staff *followed* its policies.  *See* Def.'s Opp'n 14-15.  In fact, if the policies were followed, Gregory's remains would not be missing.  While Defendant's expert testified that Wahiawa General's policies governing the storage and labeling of fetal remains conform with "applicable industry standards," *see* Killeen Decl. ¶¶ 3-4, Defendants have presented no admissible evidence[13] that Wahiawa General employees complied

---

doing something which a reasonable person would not do or failing to do something which a reasonable person would do.").

[13]  While Defendant's expert may opine on whether Defendant acted within industry standards, Defendant cannot rely on Dr. Killeen's legal opinion to establish the ultimate issue of
(continued...)

with those standards.  As noted above, Defendant could not provide a single

plausible explanation for the loss of Gregory's remains that did not involve

Defendant's personnel violating Wahiawa General's policies.

This court, therefore, GRANTS in part Plaintiff's Motion and finds

that Defendant is liable for negligence for the loss of Gregory's remains as a matter

of law.[14]

> b.     *Negligence for Defendant's delay in sending information*
> *necessary for issuance of a birth and/or death certificate*

Plaintiffs also bring their Partial Motion for Summary Judgment on

their claim for negligence based upon Defendant's delay in complying with its

polices and the statutory provisions regarding birth and/or death certificates, which

they claim led to the loss of Gregory's remains.  For the foregoing reasons,

Plaintiffs have failed to meet their summary judgment burden on this point.

---

[13](...continued)
law (*i.e.*, whether Defendant breached its duty of care in handling Gregory's remains).  *See Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1065 n.10 (9th Cir. 2002) ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, *i.e.*, an opinion on an ultimate issue of law."); *see also United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) ("Experts interpret and analyze factual evidence.  They do not testify about the law because the judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to inform the jury about the law that is relevant to their deliberations." (citation and quotation signals omitted)); *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (stating that matters of law are "inappropriate subjects for expert testimony").

[14]   The court's decision on liability is limited to breach and proximate cause (*i.e.*, that Defendant breached its duty to care for Gregory's remains which proximately caused the loss of the remains) and *does not* make any determination as to damages.

Viewing the evidence presented in the light most favorable to

Defendant, there is a genuine issue of material fact as to whether Defendant's lag

in sending the necessary information to the State for Gregory's birth and/or death

certificate constitutes negligence as a matter of law.  While the record contains

evidence that Defendant did not forward the required information for a death

certificate within three days as mandated by HRS § 338-8[15] and their own polices,[16]

*see* Pls.' Ex. 8, and that Defendant delayed in providing the State with the data for

a birth certificate even though Dr. McKenzie recorded that the child had a

heartbeat,[17] Michell Decl. ¶¶ 3-6; Pls.' Ex. 3; Pls.' Opp'n Ex. 2 at 44-45, Defendant

has countered with evidence that the postponement was reasonable under the

---

[15]  HRS §338-8 provides that:
> [a] certificate of every death or fetal death shall be filed with the
> department of health in Honolulu or with the local agent of the department
> of health in the district in which the death or fetal death occurred or a dead
> body was found within three days after the death or fetal death occurred or
> the dead body was found.  In every instance, *a certificate shall be filed
> prior to interment or other disposition of the body*.

(Emphasis added).

[16]  Defendant's policies contain provisions that require Wahiawa General to issue a death
certificate for a "neonatal death" of a live-born infant after the first seven days after birth and for
fetal death.  *See* Pls.' Exs. 14-15.

[17]  HRS § 338-5 requires registration of all births.  It states that:
> a certificate of every birth shall be substantially completed and filed with
> the local agent of the department in the district in which the birth
> occurred, by the administrator or designated representative of the birthing
> facility, or physician, or midwife, or other legally authorized person in
> attendance at the birth; or if not so attended, by one of the parents.

circumstances due to confusion as to whether Gregory was a live birth or stillbirth. *See* Michell Decl. ¶¶ 3-6; Def.'s Opp'n Ex. C at 14-15.  Specifically, Defendant has presented evidence that during this time, Wahiawa General employees actively investigated whether a birth and/or death certificate should be issued because only January reported the presence of Gregory's heartbeat.  *See id.*  Considering this evidence, a reasonable person could find that Wahiawa General's delay was reasonable under the circumstances, and therefore, did not breach the standard of care.

Because there is a genuine issue of material fact as to whether Defendant's delay regarding the birth and death certificates was reasonable, the court DENIES Plaintiffs' Partial Motion for Summary Judgment as to this conduct.

## B.   Defendant's Motion for Partial Summary Judgment

Defendant argues that Plaintiffs' claims for intentional infliction of emotional distress ("IIED") and derivative punitive damages fail as a matter of law. For the foregoing reasons, the court disagrees and finds that Defendant has not met its summary judgment burden.

### 1.   IIED Law

"The elements of the tort of intentional infliction of emotional distress are 1) that the act allegedly causing the harm was intentional or reckless, 2) that the

act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." *See Hac v. Univ. of Haw.*, 102 Haw. 92, 106-07, 73 P.3d 46, 60-61 (2003) (adopting IIED standard from Restatement (Second) of Torts).

To demonstrate the first element, a plaintiff must show that the defendant acted either with a "desire to inflict severe emotional distress, . . . where he knows that such distress is certain, or substantially certain, to result from his conduct" or "recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow." Restatement (Second) Torts Section 46, cmt. i (1965); *see also Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1014, 863 P.2d 795, 828 (1993) ("[D]efendant's conduct is in reckless disregard of the probability of causing emotional distress if [he] . . . has knowledge of a high degree of probability that emotional distress will result and acts with deliberate disregard of that probability or with a conscious disregard of the probable results."); *State v. Carpenter*, 171 P.3d 41, 58 (Alaska 2007) (noting that an IIED plaintiff must show that "the defendant acted in deliberate disregard of a high degree of probability that the emotional distress will follow" to prove a reckless mental state).

Recklessness, unlike negligence, involves more than "inadvertence, incompetence, unskillfulness, or a failure to take precautions" but instead rises to the level of a "conscious choice of a course of action . . . with knowledge of the

serious danger to others involved in it."  *See* Restatement (Second) Torts, § 500,

cmt. g; *Iddings v. Mee-Lee*, 82 Haw. 1, 11, 919 P.2d 263, 273 (1996) ("The usual

meaning assigned to . . . 'reckless,' . . . is that the actor has intentionally done an

act of an unreasonable character in disregard of a risk known to or so obvious that

he . . . must be taken to have been aware of it, and so great as to make it highly

*probable* that harm would follow.").  As is clear, context matters in determining if

conduct is reckless.

   *Ross v. Stouffer Hotel Co.*, 76 Haw. 454, 879 P.2d 1037 (1994),

describes what constitutes sufficiently "outrageous" conduct:

> Liability has been found only where the conduct has been so
> outrageous in character, and so extreme in degree, as to go
> beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community.
> Generally, the case is one in which the recitation of the facts to
> an average member of the community would arouse his
> resentment against the actor, and lead him to exclaim,
> "Outrageous!"

76 Haw. at 465 n.12, 879 P.2d at 1048 n.12 (citation and quotation signals

omitted); *see also Shoppe v. Gucci Am., Inc.*, 94 Haw. 368, 387, 14 P.3d 1049,

1068 (2000) (stating that an act is outrageous if it is "without just cause or excuse

and beyond all bounds of decency").  "The question whether the actions of the

alleged tortfeasor are . . . outrageous is for the court in the first instance, although

where reasonable persons may differ on that question it should be left to the jury."

*Nagata v. Quest Diagnostics, Inc.*, 303 F. Supp. 2d 1121, 1127 (D. Haw. 2004)

(citing *Shoppe*, 94 Haw. at 387, 14 P.3d at 1068).

Extreme or severe "emotional distress is defined as mental suffering,

mental anguish, mental or nervous shock [,] . . . includ[ing] horror, grief, shame,

humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea."

*Hac*, 102 Haw. at 106, 73 P.3d at 60 (citation and quotation signals omitted);

*Enoka v. AIG Haw. Ins. Co.*, 109 Haw. 537, 559, 128 P.3d 850, 872 (2006)

("'[E]xtreme emotional distress' constitutes, inter alia, mental suffering, mental

anguish, nervous shock, and other 'highly unpleasant mental reactions.'").  To

show extreme emotional distress, Plaintiff must produce evidence that "a

reasonable [person], normally constituted, would be unable to adequately cope

with the mental stress engendered by the circumstances of the case."  *Shoppe*, 94

Haw. at 386, 14 P.3d at 1068; *Rodrigues v. State*, 52 Haw. 156, 173, 472 P.2d 509,

520 (1970) ("[S]erious mental distress may be found where a reasonable man,

normally constituted, would be unable to adequately cope with the mental stress

engendered by the circumstances of the case.").

"Medical proof can be offered to assist in proving the 'seriousness' of

the claim and the extent of recovery, but should not be a requirement allowing or

barring the cause of action.  Once the trial court . . . is satisfied that the distress is

23

'serious,' the duration and symptoms of the distress affect the amount of recovery."

*Campbell v. Animal Quarantine Station*, 63 Haw. 557, 564-65, 632 P.2d 1066,

1070-71 (1981); *see also Hac*, 102 Haw. at 106, 73 P.3d at 60 ("[B]odily injury,

while compensable, is not necessary to establish severe emotional distress.").

### 2.   *Application*

Defendant argues that Plaintiffs have failed to demonstrate an IIED

claim as a matter of law.  The court disagrees.

As a preliminary matter, Defendant applies the incorrect, pre-*Hac*

elements of an IIED claim.  *See* Def.'s Mot. 8.  Prior to *Hac*, the elements of IIED

were "(1) that the act allegedly causing the harm was intentional; (2) that the act

was unreasonable; and (3) that the actor should have recognized that the act was

likely to result in illness."  *Hac*, 102 Haw. at 105, 73 P.3d at 59 (quotation signals

omitted).  *Hac*, however, established the following elements of an IIED claim:

"1) that the act allegedly causing the harm was intentional *or reckless*, 2) that the

act was outrageous, and 3) that the act caused 4) extreme emotional distress to

another."  *Id.* at 106-07, 73 P.3d at 60-61 (adopting approach set forth in the

Restatement (Second) of Torts) (emphasis added).

///

///

24

### a.    Recklessness

Viewing the evidence in the light most favorable to Plaintiffs, the court cannot conclude that Defendant's conduct was not reckless as a matter of law -- in other words, that Defendant did not make a "conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it."  *See* Restatement (Second) Torts, § 500, cmt. g.  Namely, Plaintiffs have provided evidence that, due to Defendant's delay, a death certificate was not certified until over six months after Gregory's death on February 12, 2007, with full knowledge that bodies shall not be removed from the morgue without a death certificate, *see* Pls.' Exs. 14-15, and the morgue could not accommodate bodies for a long period of time.  *See* Pls.' Ex. 12 ¶ 6.  Further, Defendant's own expert hypothesizes that someone with access to the locked morgue may have "inadvertently" discarded the remains, *see* Killeen Decl. ¶ 7, although Gregory's body was wrapped in a chux and blanket in a small basin per Defendant's requirement for storage of infant remains.  *See* Michell Decl. ¶ 8; Pls.' Ex. 14 at A000012.  Finally, Gregory's remains were misplaced never to be found.  Based upon this evidence and given the particular context of this case, a reasonable person could find that Defendant acted recklessly.  *Iddings*, 82 Haw. at 11, 919 P.2d at 273 ("The usual meaning assigned to . . . 'reckless,' . . . is that the actor has intentionally done an act of an

25

unreasonable character in disregard of a risk known to or so obvious that he

. . . must be taken to have been aware of it, and so great as to make it highly

*probable* that harm would follow.")  Thus, the court cannot find that Defendants

were not reckless as a matter of law.

       *b.*     *Outrageousness*

      Defendant has not established that its acts were not outrageous as a

matter of law.  There is evidence that due to Defendant's delay Plaintiffs did not

receive either Gregory's birth or death certificate for over six months, *see* Pls.'

Exs. 7-8; Michell Decl. ¶¶ 2-6; Pls.' Opp'n Ex. 2 at 44-45, had knowledge of their

small morgue, ill equipt for long-term storage, *see* Pls.' Ex. 12 ¶ 6, and ultimately

lost baby Gregory's remains.  A reasonable fact finder could certainly find that the

recitation of these facts to an average member of the community would arouse his

sentiment against Wahiawa General and lead him to exclaim, "Outrageous!"  *See*

Restatement (Second of Torts) § 46, cmt. d; *In re Air Crash Disaster Near*

*Cerritos, Cal., Aug. 31, 1986*, 973 F.2d 1490, 1498 (9th Cir. 1992) (J., Rymer,

dissenting) (citing Supreme Court of California case for proposition that "conduct

in mortuaries in mishandling remains was 'outrageous and reprehensible'").

///

///

26

    *c.*    *Extreme Emotional Distress*

Contrary to Defendant's conclusory assertions, Plaintiffs have put

forth sufficient evidence of severe emotional distress to avoid summary judgment.

It is undisputed that Defendant misplaced Plaintiffs' son's remains.  Certainly, a

reasonable person, "normally constituted" may be unable to cope with such a loss.

*See Rodrigues*, 52 Haw. at 173, 472 P.2d at 520 ("[S]erious mental distress may be

found where a reasonable man, normally constituted, would be unable to

adequately cope with the mental stress engendered by the circumstances of the

case."); *see also Leong v. Takasaki*, 55 Haw. 398, 403, 520 P.2d 758, 762 (noting

there is a special likelihood that mental distress will result from the negligent

mishandling of corpses).  Further, Plaintiffs have provided evidence that they have

experienced mental suffering and anguish in the form of anxiety, depression, and

shock.  *See* Pls.' Opp'n Exs. 1 at 119-124, 5 at 55.  While Defendant asserts that

Plaintiffs' evidence of emotional distress is insufficient, *see* Def.'s Reply 8-9,

Plaintiffs have put forth adequate evidence of their continued suffering to raise a

genuine issue of fact for trial.

    Additionally, because the enormity of losing Gregory's corpse

"carries the conviction that there has in fact been severe emotional distress,"

Plaintiffs need not submit proof of physical injury to prove the fourth element of

their IIED claim. *See Hac*, 102 Haw. at 106, 73 P.3d at 60 ("[I]f the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required."); *see also Guth*, 96 Haw. at 159, 28 P.3d at 994 (Acoba, J., concurring in part and dissenting in part) ("[T]here is near universal agreement that a reasonable person, normally constituted, may be unable to adequately cope with the mental stress engendered by the desecration of a deceased family member's remains.").[18]

Because Defendant has failed to meet its summary judgment burden, the court DENIES Defendant's Motion for Summary Judgment on Count II of Plaintiffs' Complaint.

### 3.   *Punitive Damages*

Because Plaintiffs' IIED claim survives summary judgment, the court denies Defendant's derivative request for summary judgment of Plaintiffs' incidental claim for punitive damages. *See Kang v. Harrington*, 59 Haw. 652, 660, 587 P.2d 285, 291 (1978) ("An award of punitive damages is purely incidental to

---

[18]   Defendant's assertion that "it is generally understood that a showing of physical injury is required for proof of severe emotional distress for IIED claims" utterly mistakes the law.  *See* Def.'s Mot. 9.  To the contrary, "bodily injury, while compensable, is not necessary to establish severe emotional distress" in an IIED claim.  *Hac v. Univ. of Haw.*, 102 Haw. 92, 106, 73 P.3d 46, 60 (2003).  Severe emotional distress "is not . . . limited to cases where there has been bodily harm; and if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone without such harm."  *See id.*

the cause of action."); *see also Lee v. Aiu*, 85 Haw. 19, 34, 936 P.2d 655, 670

(1997) (holding record contained substantial evidence that defendants engaged in

"aggravated or outrageous misconduct" required to impose punitive damages

where IIED claim also stood).  Thus, the court DENIES Defendant's Motion for

Partial Summary Judgment on Count IV of Plaintiffs' Complaint.

## V.  <u>CONCLUSION</u>

For the reasons stated above, the court (1) GRANTS in part and

DENIES in part Plaintiffs' Motion for Partial Summary Judgment as to Liability

and (2) DENIES Defendant's Motion for Partial Summary Judgment on Counts II

and IV of Plaintiffs' Complaint Regarding Claims for IIED and Punitive Damages.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 20, 2009.



/s/ J. Michael Seabright
————————————————
J. Michael Seabright
United States District Judge

*Ritchie et al. v. Wahiawa Gen. Hosp. et al.*, Civ. No. 08-00133 JMS/LEK; Order (1) Granting in
Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment as to Liability of
Defendant Wahiawa General Hospital and (2) Denying Defendant's Motion for Partial Summary
Judgment on Counts II and IV of Plaintiffs' Complaint Regarding Claims for Intentional
Infliction of Emotional Distress and Punitive Damages